IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CLAUDE SAKR, LAURA JACKSON, and MARGARET SKENDERIAN,<br><br>　　　　　Plaintiffs,<br>　　v.<br><br>CITY OF PORTLAND, UNITED STATES DEPARTMENT AND HOUSING AND URBAN DEVELOPMENT, SCOTT TURNER, and HOME FORWARD,<br>　　　　　Defendants. | Case No.: 3:24-cv-01265-AN<br><br><br>OPINION AND ORDER |

Plaintiffs Claude Sakr, Laura Jackson, and Margaret Skenderian (together, "plaintiffs") brought this action seeking judicial review under the Administrative Procedures Act ("APA") of defendant City of Portland's (the "City") decision to issue an Environmental Assessment and Finding of No Significant Impact for a new affordable housing development under the National Environmental Policy Act ("NEPA") 42 U.S.C. §§ 4321 *et seq.* Plaintiffs additionally seek review of the related actions of the United States Department of Housing and Urban Development ("HUD"); Scott Turner, in his official capacity as Secretary of HUD (together with HUD, the "federal defendants"); and Home Forward (together with the City and the federal defendants, "defendants").

Pending before the Court now are seven motions: (1) plaintiffs' motion to complete or, alternatively, supplement the administrative record; (2) plaintiffs' motion for summary judgment; cross-motions for summary judgment filed separately by (3) Home Forward, (4) the City, and (5) the federal defendants; (6) plaintiffs' motion for leave to file a supplemental memorandum and (7) plaintiffs' subsequent motion for leave to withdraw that motion. After reviewing the parties' filings, the Court finds that oral argument will not help resolve this matter. Local R. 7-1(d). For the reasons stated below, plaintiffs'

motion to complete or supplement the administrative record is denied; plaintiffs' motion for summary judgment is denied; defendants' cross-motions for summary judgment are granted; and plaintiffs' motion for leave to withdraw the initial motion for leave is granted.

## LEGAL STANDARDS

### A.    Judicial Review and Summary Judgment

####    1.    *Judicial Review*

An agency's compliance with NEPA is reviewed under the APA.  *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (collecting cases).  In APA cases, "the district court is reviewing a decision of an administrative agency which is itself the finder of fact."  *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1984).  Therefore, "'the district judge sits as an appellate tribunal.'"  *Herguan Univ. v. Immigr. & Customs Enf't*, 258 F. Supp. 3d 1050, 1063 (N.D. Cal. 2017) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)).  When reviewing an agency's decision, the Court must set aside that decision if, in relevant part, the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence."  5 U.S.C. §§ 706(2)(A), (E).  Agency decisions or actions are arbitrary and capricious if:

> "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*").

Though the standard is a "'narrow one,'" courts must still "'engage in a substantial inquiry[,] . . . a thorough, probing, in-depth review.'"  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (alterations in original) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).  Generally, an agency's analysis is entitled to deference, particularly when the analysis is undertaken "within [the agency's] area of competence."  *Az. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir.

2010).  However, no deference is necessary "when the agency's decision is without substantial basis in fact" or if there is no "rational connection between the facts found and the determinations made." *Id.*  Ultimately, agencies' decisions must be upheld "'so long as the agencies have considered the relevant factors and articulated a rational connection between the factors found and the choices made.'"  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (quoting *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 953-54 (9th Cir. 2003)); *see State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Summary judgment "is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did" and determining "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Occidental Eng'g Co.*, 753 F.2d at 769-70.

2.    *Summary Judgment*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).  However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphases omitted).  The substantive law determines which facts are material.  *Id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue

of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *Id.* at 325. Instead, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *Celotex*, 477 U.S. at 324. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255.

**B.    NEPA Standards[1]**

NEPA establishes "a national policy [to] encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. To meet NEPA's "'twin aims'" of ensuring that federal agencies "'consider every significant aspect of the environmental impact of a proposed action'" and "'inform the public that [the agency] has indeed considered environmental concerns in its decision making process," federal agencies must adequately assess the environmental impacts of federal actions. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)). To do this, agencies must prepare an Environmental Assessment ("EA") "determin[ing] whether the action will have a significant effect on the environment." *Id.* at 1067. If the agency determines it will have such an effect, then the agency must prepare an Environmental Impact Statement ("EIS"). *Id.* If, on the other hand, "the EA reveals no significant effect," then "the agency may issue a Finding of No Significant Impact ('FONSI')." *Id.*

NEPA "'requires no more'" than the preparation of an adequate report. *Seven Cnty. Infrastructure*

---

[1] The NEPA regulations cited and referred to throughout this Opinion and Order are those in effect during the relevant period, and thus as amended in 2020. 86 Fed. Reg. 43,304 (July 16, 2020). The Council on Environmental Quality ("CEQ") regulations have since been rescinded, but the parties agree that the recission does not affect the standards applicable to this case. *See* 90 Fed. Reg. 10,610 (Feb. 25, 2025); *see also* Pls. Mot. for Summ. J., ECF [32], at 2 n.1; *and see* City Resp. to Pls. Mot. for Summ. J., ECF [35], at 9.

*Coal. v. Eagle County.*, 605 U.S. 168, 180 (2025) ("*Seven Cnty.*") (quoting *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 228 (1980) ("*Karlen*")).  This is because NEPA is a "purely procedural statute" that "imposes no substantive environmental obligations or restrictions."  *Id.* at 173.  Instead, "NEPA 'establishes action-forcing procedures that require agencies to take a hard look at environmental consequences.'" *Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 879 (9th Cir. 2025) (quoting *Kern*, 284 F.3d at 1066).  NEPA "prescribes the necessary process" to analyze environmental impacts and prepare related documents, but "NEPA itself does not mandate particular results."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see Seven Cnty.*, 605 U.S. at 180 ("Because an EIS is only one input into an agency's decision and does not itself require any particular substantive outcome, the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained").  As the Supreme Court recently emphasized, NEPA "does not require the agency to weigh environmental consequences in any particular way" because "[t]he goal of the law is to inform agency decisionmaking, not to paralyze it."  *Seven Cnty.*, 605 U.S. at 173.

When reviewing a NEPA challenge, a court may not "interject itself within the area of discretion as to the choice of the action to be taken by the agency."  *Id.* at 185 (cleaned up).  Rather, the court must take on a limited role and afford the agency "substantial deference."  *Id.* at 180, 183, 192.  Indeed, "[t]he bedrock principle of judicial review in NEPA cases can be stated in a word: Deference."  *Id.* at 185.

## C.    Completing the Administrative Record

"Generally, judicial review of agency action is limited to review of the record on which the administrative decision was based."  *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation omitted).  Judicial review, however, must be based on "the whole record" under the APA.  5 U.S.C. § 706.  The whole administrative record "includes everything that was before the agency pertaining to the merits of its decision."  *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).  This means that the record "consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position."  *Thompson*,

885 F.2d at 555 (emphasis in original) (quoting *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 32 (N.D. Tex. 1981)).

Agencies are entitled to a presumption that they have submitted the whole record. *See Goffney v. Becerra*, 995 F.3d 737, 748 (9th Cir. 2021). A party challenging the completeness of the submitted record therefore "bears the burden of overcoming the presumption of regularity by 'clear evidence.'" *Xerces Soc'y for Invertebrate Conservation v. Shea*, 682 F. Supp. 3d 948, 953 (D. Or. 2023) (quoting *Nw. Env't Advocs. v. U.S. Fish & Wildlife Serv.*, No. 3:18-cv-01420-AC, 2019 WL 6977406, at *4 (D. Or. Dec. 20, 2019)). To overcome the presumption, a challenging party must:

> "(1) identify reasonable non-speculative grounds for its belief that the documents at issue were considered by the agency and not included in the record, and (2) identify the materials allegedly omitted from the record with sufficient specificity, as opposed to merely proffering broad categories of documents . . . that are likely to exist."

*Nw. Env't Advocs.*, 2019 WL 6977406, at *5 (cleaned up). It is not enough to "'assert[] that the documents are relevant, were before or in front of the agency at the time it made its decision, and were inadequately considered.'" *Id.* (quoting *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006)). Instead, a party "must 'put forth concrete evidence' to demonstrate that the administrative record is incomplete." *Id.* (quoting *Pac. Shores*, 265 F. Supp. 2d at 6).

## D.    Supplementing the Administrative Record

Parties may also move to supplement the administrative record. While "'completing the record' refers to including 'materials which were actually considered by the agency, yet omitted from the administrative record,' . . . 'supplementing the record' refers to 'including materials that were not considered by the agency, but which are necessary for the court to conduct a substantial inquiry.'" *Bruce v. Azar*, 389 F. Supp. 3d 716, 724 n.5 (N.D. Cal. 2019) (quoting *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1274 (D. Colo. 2010)), *aff'd*, 826 F. App'x 643 (9th Cir. 2020). Typically, courts may not consider extra-record evidence because doing so "'inevitably leads the reviewing court to substitute its judgment for that of the agency.'" *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014) ("*Locke*") (quoting *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980)). However, the Ninth Circuit

has recognized four limited exceptions:

> "(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith."

*Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (cleaned up). These exceptions are to be "narrowly construed and applied." *Id.* The party seeking to supplement the record "bears the burden of demonstrating that a relevant exception applies." *Locke*, 776 F.3d at 993. To meet this "'heavy burden,'" the "party must present more than broad categories of documents that were excluded. It must make a 'particularized showing' of what specific documents it seeks to" have supplemented. *Xerces Soc'y*, 682 F. Supp. 3d at 955 (first quoting *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010); and then quoting *Save the Colo. v. U.S. Dep't of the Interior,* 517 F. Supp. 3d 890, 901 (D. Ariz. 2021)).

## BACKGROUND

### A. Factual Background

#### 1. *The Peaceful Villa Redevelopment Project*

The Peaceful Villa Apartments (the "Apartments") were constructed in the 1940s in the Richmond neighborhood of Portland, Oregon. CITY_00004034.[2] The Apartments consisted of eighteen low-rise buildings containing seventy affordable housing units spread across approximately four acres. CITY_00000217. The Apartments are owned by Home Forward, a public housing authority. *Id.*

In December 2021, Home Forward announced its intent to redevelop the Apartments into new, higher-density affordable housing through the Peaceful Villa Redevelopment Project (the "Project"). CITY_00004032-52. The Project intended to replace the seventy existing units and add ninety-six new units, providing a total of 166 housing units at its completion. *Id.* Ultimately, the goal of the Project is "to provide affordable housing in an underserved area of [the] City of Portland" by redeveloping the

---

[2] All record cites to documents beginning with "CITY_" are from the administrative record, which was filed on January 31, 2025. *See* ECF [27], [28], [31].

Apartments "into a modern affordable housing development that consist[s] of three apartment buildings, courtyards, community facilities, and parking."  CITY_00000217.  The Project includes a mix of studio, one-bedroom, and larger apartments, with all units reserved for low-income renters.  *Id.*  The Project will additionally make improvements to Southeast Woodward Street to allow for two-way vehicle access and a sidewalk.  *Id.*

The Project is estimated to cost over $95 million, a portion of which is to be financed with federal Rental Assistance Demonstration ("RAD") funds administered by HUD.  CITY_00000219.  Because of this, the Project must comply with NEPA.  The City therefore elected to serve as the "Responsible Entity" under NEPA 24 C.F.R. § 58, with HUD playing a supervisory role.

2.    *NEPA Process and Public Outreach*

Home Forward began outreach about the plans for the Project with residents in late 2021 and with community groups in April 2022.  CITY_00000248; CITY_00004035.  This continued for approximately one-and-a-half years.  *Id.*  During this time, it held focus groups with residents of the Apartments and other low-income families; meetings with the Richmond Neighborhood Association; meetings with the Apartments' Community Advisory Committee ("CAC"), which included Sakr and Skenderian; meetings with neighbors regarding street design; and multiple additional meetings with individual neighbors.  *See* CITY_00001003; CITY_00001384-89.

As a result of the community's input, Home Forward made several changes to the Project design including, among other changes, reducing the unit count, increasing the amount of parking spaces and disabled parking spaces, adding private entry stoops to ground floor units, eliminating a proposed fourth story from most areas of the building, adjusting building sizes and heights to feel more "residential," moving a building back from the street, and implementing energy-efficiency features.  CITY_00000248-49; CITY_00004036-41; CITY_00003551-53; CITY_00003556-58.

In mid-2023, the City initiated an EA for the Project pursuant to 24 C.F.R. §§ 58.36–58.40.  The initial draft was prepared by Home Forward with the assistance of Dudek, an independent environmental

consultant.  CITY_00001678; CITY_00000216.  The City was responsible for certifying and submitting the EA to HUD and, throughout 2023, regularly communicated with Home Forward and Dudek to discuss the Project.  *See, e.g.*, CITY_00004030; CITY_00002839-45; CITY_00002800-04; CITY_00002629.  The City's Certifying Officer, Anna Shook, also conferred with experts about various aspects of the EA.  *See* CITY_00002942-43; CITY_0001675-76.

On November 15, 2023, the City released the draft EA and Notice of FONSI which concluded that the Project would have "no significant impact" on the human environment.  CITY_00001587-89; CITY_00002769-70.  The City published the EA and FONSI on the Portland Housing Bureau's website, CITY_00002630-31; published the Notice of FONSI and Notice of Intent to Request Release of Funds ("RROF") in *The Oregonian* newspaper, CITY_00002644-47; and emailed certain community members who had expressed interest in the Project, including Sakr and the chair of the Richmond Neighborhood Association, CITY_00001684-86.  Although HUD regulations require a fifteen-day comment period following publication of a notice of FONSI, the City provided a thirty-three-day comment period in response to an extension request received from the Richmond Neighborhood Association.  *Id.*; CITY_00000299.

The comment period lasted from November 16, 2023, until December 18, 2023, during which time the City received over 300 individual specific comments from twelve commenters, including all three plaintiffs.  CITY_00000299-328; *see, e.g.*, CITY_00000671 (responding to Skenderian's public comment); CITY_00001569-70 (attaching public comments by Sakr and Jackson).  These comments raised at least nineteen concerns about the Project's impact, including but not limited to traffic congestion, displacement of residents during construction, loss of green space, strain on local infrastructure, construction noise, and air quality impacts.  CITY_00000299-328.  Some commenters also remarked that the EA failed to consider any alternative project designs beyond the one proposed by Home Forward and a "no action" scenario.  CITY_00000303-05.  The City provided individual responses to certain comments received during this time and prepared a separate, comprehensive response organized by topic.  CITY_00000299-328

(providing a comprehensive response to public comments); CITY_00000727-51 (pointing individual commentors, including Sakr and Skenderian, to responses within the comprehensive summary). The comments and comprehensive response were posted on the HUD public environmental review site and made available at the City's HUD environmental review webpage. CITY_00000299.

On February 2, 2024, the City's Certifying Officer and Home Forward completed an Environmental Certification. CITY_00000208. That same day, the City issued the final EA and FONSI. CITY_00000216-94.

On February 15, 2024, Sakr and Jackson sent a letter to the City expressing their ongoing objections to the EA, including that the proposed design was not changed to the requested "design alternatives." CITY_00000115-28. Sakr and Jackson stated that they "fully support the development of a public housing project on the property, at the proposed density," but that they did not believe the neighborhood should be impacted to address the current "housing crisis." CITY_00000121. Sakr and Jackson additionally submitted written objections to HUD, complaining that the City "failed to comply with NEPA" primarily because the EA did not consider "a series of smaller, multi-family townhomes" as proposed by plaintiffs. CITY_00000115-18. HUD responded by confirming that the City followed the NEPA procedures and found that none of the objections raised by plaintiffs necessitated further HUD review. CITY_00000055-56. On March 29, 2024, HUD approved the Request for Release of Funds and allowed the project to move forward. CITY_00000003.

## B.    Procedural Background

Plaintiffs initiated this action on August 2, 2024, and filed the operative first amended complaint on August 23, 2024. Compl., ECF [1]; 1st Am. Compl., ECF [12]. Plaintiffs bring four causes of action under NEPA, alleging (1) the City's finding of no significant impact was unlawful, (2) the NEPA processes did not include sufficient public involvement, (3) the EA contains an inadequate environmental assessment, and (4) the EA failed to consider a reasonable range of alternatives. 1st Am. Compl. ¶¶ 18-36.

The City lodged the administrative record on January 31, 2025. *See* ECF [27], [28], [29], [30],

[31]. Plaintiffs moved for summary judgment on March 3, 2025. Pls. Mot. for Summ. J. ("Pls. MSJ"), ECF [32]. Defendants Home Forward and the City each cross-moved for summary judgment on April 9, 2025. Def. Home Forward Cross-Mot. for Summ. J. ("Home Forward Cross-MSJ"), ECF [34]; Def. City Cross-Mot. for Summ. J. ("City Cross-MSJ"), ECF [36]. The federal defendants cross-moved for summary judgment on April 16, 2025. Federal Defs. Cross-Mot. for Summ. J., ECF [37]. On April 30, 2025, plaintiffs moved to complete or, alternatively, supplement the administrative record. Pls. Mot. to Complete or Suppl. Admin. R., ECF [38].

On May 7, 2025, while the summary judgment briefing was ongoing, plaintiffs moved for a preliminary injunction. Pls. Mot. for Prelim. Inj., ECF [39]. The Court held oral argument on the preliminary injunction motion on May 20, 2025. Mins. of Proceedings of May 20, 2025, ECF [51]. On June 2, 2025, the Court issued an Opinion and Order denying the preliminary injunction. Op. & Order of June 2, 2025, ECF [53].

The parties subsequently completed briefing on the outstanding motions. On August 21, 2025, plaintiffs filed a motion for leave to file a supplemental memorandum. Pls. Mot. for Leave to File Suppl. Mem., ECF [57]. However, on September 13, plaintiffs sought leave to withdraw that motion. Pls. Notice Re: Withdrawal of Mot., ECF [61].

## DISCUSSION

### A.     Standing

Defendants do not dispute that plaintiffs have standing to bring this action, "[b]ut it is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). To establish Article III standing, the plaintiffs "must show (1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant[s]; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*,

528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Article III standing, alone, is not sufficient; plaintiffs "challenging an agency's compliance with NEPA must [also] establish prudential standing by demonstrating that its injury falls 'within the zone of interests to be protected by the statute.'" *Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 990 (9th Cir. 2023) (quoting *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1103 (9th Cir. 2005)).

1. *Injury in Fact*

When a plaintiff alleges deficiencies with an EA or EIS, "a cognizable procedural injury exists . . . under [NEPA] when the plaintiff also alleges a 'concrete' interest—such as an aesthetic or recreational interest—that is threatened by the proposed action." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004). The Ninth Circuit has "described this 'concrete interest' test as requiring a 'geographic nexus' between the individual asserting the claim and the location suffering an environmental impact." *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001) (quoting *Douglas County v. Babbitt*, 48 F.3d 1495, 1501 n.5 (9th Cir. 1995)). Here, plaintiffs live close to the Project site and contend that faults with the EA process will damage their interests related to the Project's impact on neighborhood character, crime, and traffic. *See, e.g.,* CITY_00001564-68 (indicating that Sakr and Jackson live in the immediate vicinity of the project and asserting interests related to, among other things, "residential context and character," crime, and traffic). This is sufficient for the purposes of Article III standing to establish a procedural injury in fact.

2. *Causation & Redressability*

"Once a plaintiff has established an injury in fact under NEPA, the causation and redressability requirements are relaxed." *Cantrell*, 241 F.3d at 682. Importantly, "plaintiffs asserting procedural standing need not demonstrate that the ultimate outcome following proper procedures will benefit them." *Id.* (collecting cases). Because plaintiffs can establish proximity to the Project site and an injury in fact, that is adequate to satisfy Article III causation and redressability requirements.

3.    *Zone of Interests*

Even where plaintiffs can establish Article III standing, they must still demonstrate prudential standing by showing that they are in the "zone of interests" of the statute at issue.  *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 715-16 (9th Cir. 1993).  "The purpose of the 'zone of interests' test is 'to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives.'"  *Id.* at 716 (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987)).  The purposes of NEPA are:

> "To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality."

42 U.S.C. § 4321.  Courts have generally phrased NEPA's statutory objective as "to protect the environment, not the economic interests of those adversely affected by agency decisions."  *E.g. Nev. Land Action Ass'n*, 8 F.3d at 716 (emphasis added) ("[A] plaintiff who asserts *purely* economic injuries does not have standing to challenge an agency action under NEPA."); *see, e.g.*, *Oceans v. U.S. Dept. of the Interior*, No. 1:24-cv-141-RCL, 2025 WL 973540, at *6 (D.D.C. 2025) ("NEPA's zone of interests extends to 'protecting the physical environment.'" (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 773 (1983))).  It is well-established that aesthetic interests fall within the purview of environmental interests.  *See, e.g.*, *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1236 (D.C. Cir. 1996); *Powder River Basin Resource Council v. U.S. Dept. of Interior*, 749 F. Supp. 3d 151, 163 (D.D.C. 2024).

Put differently, "[t]o find that [a plaintiff's] interests do not fall inside the 'zone of interests' protected by NEPA," a court must "find that (1) the [plaintiff's] interests are inconsistent with the purposes of NEPA, and that (2) the interests are so inconsistent that it would be unreasonable to assume that Congress intended to permit the suit."  *Douglas County*, 48 F.3d at 1500.  This rule reflects the fact that "[t]he zone of interests test is not intended to impose an onerous burden on the plaintiff and 'is not meant to be especially

demanding.'" *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005) (quoting *Clarke*, 479 U.S. at 399)).

Defendants do not dispute that plaintiffs are within the zone of interests that NEPA was designed to protect. Plaintiffs generally contend that, due to defendants' actions, plaintiffs will "experience increased traffic congestion, safety concerns, and changes to the visual landscape." Pls. MSJ 16. The record consistently reflects plaintiffs' interest in the Project's impact on traffic, public safety, utilities, neighborhood character, and the visual landscape. *See, e.g.*, CITY_00001564-68 (Sakr and Jackson asserting interest in Project impacts on community "context and character," emergency services, utility capacity, and noise); CITY_00003779-822 (Skenderian asserting interest in Project impacts on resident well-being and community safety). The Court finds that plaintiffs' concerns are sufficient to fall within NEPA's zone of interests. *Compare Oceans*, 2025 WL 973540, at *9 (deeming within NEPA's zone of interests "property owners['] concern[s] with the aesthetic effect of an undertaking on a historic site 'next to and on their property'"), *and Powder River Basin Resource Council*, 749 F. Supp. 3d at 163 (citation and quotation marks omitted) (deeming within NEPA's zone of interests alleged injuries including disturbances to the landscape and "noise, light, and visual impacts, including truck traffic"), *with Nev. Land Action Ass'n*, 8 F.3d at 716 (concluding that assertions of "'lifestyle loss' as well as economic loss" were inadequate to establish prudential standing because the actions sought by the plaintiff would not benefit the environment), *and Cal. Forestry Ass'n v. Thomas*, 936 F. Supp. 13, 22 (D.D.C. 1996) (deeming "[t]he timber industry [to be] a 'peculiarly *un* suitable proxy for those whom Congress intended to protect, and [the plaintiff to] therefore not [be] within the zone of interests'" (quoting *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 927 (D.C. Cir. 1989))).

## B.    Plaintiffs' Motion to Complete or Supplement the Administrative Record

### 1.    *Completing the Administrative Record*

Plaintiffs have not put forth clear evidence sufficient to overcome the presumption of completeness. *See Xerces Soc'y*, 682 F. Supp. 3d at 953. Plaintiffs' motion to complete or supplement the administrative

record generally identifies two buckets of documents that plaintiffs argue have been omitted: (1) four letters sent by plaintiffs in 2022; and (2) five general categories of documents.  The Court first addresses the general categories of documents, and then the identified letters.

a.    Categories of Unspecified Documents

As a threshold matter, plaintiffs do not sufficiently identify most of the documents they believe defendants have omitted from the record.  Aside from the four letters, plaintiffs do not identify any specific documents as missing.  *See* Pls. Mot. to Complete or Suppl. Admin. R. 8-9.  Plaintiffs instead seek the following categories of documents:

> "-  Documents covering the complete timeline of the NEPA process from at least late 2021 to October 2022 (where the present record begins);
> -  Documents showing the City['s] active participation in the review process conducted by Home Forward and Dudek;
> -  Internal documents prepared or considered by Home Forward and Dudek which were indirectly considered by the City;
> -  Communications between Home Forward and Dudek which were indirectly considered by the City; and
> -  Internal documents and communications between Home Forward and BORA Architects relating to any site design alternatives which were indirectly considered by the City."

*Id.* at 4.

The cases plaintiffs cite help illustrate why these requests are insufficient.  First, in *Wildearth Guardians v. Salazar*, the District of Colorado required the moving party to "clearly set forth in its motion: (1) when the documents were presented to the agency; (2) to whom; (3) and under what context."  713 F. Supp. 2d 1243, 1255 (D. Colo. 2010).  The movant there identified forty-two specific documents by date, title, sender, and recipient.  *See id.* at 1257-58.  Second, *L.C. v. Alta Lama School District* concerned specific settlement communications that the administrative law judge had improperly ruled inadmissible.  No. 5:18-cv-01535-SVW-SHK, 2019 WL 6620506, at *1 (C.D. Cal. Feb. 22, 2019).  Third, in *Audubon Society v. U.S. Army Corps of Engineers*, a court in this district granted a request to supplement the record with information on the narrow technical "issue of how or whether implementation of the Corps' management plan for cormorants on East Sand Island or in the Columbia River estuary is likely to affect the number of

15

returning salmon or increase productivity of listed salmon and steelhead adults[.]"  No. 3:15-cv-0665-SI, 2015 WL 13649299, at *4 (D. Or. May 5, 2015).  Even then, the court limited the request to "all documents in the possession, custody, or control of the agencies," and noted that the court's decision to grant the request to supplement the record was based in part on the court's conclusion that it "need[ed] access to the requested information" in order to properly undertake its review of the agencies' decision under NEPA and the APA. *Id.*

Here, plaintiffs' requested categories of documents do not offer the necessary specificity.  Only the first and fifth categories are bound by time, and the first four categories are all generally vague as to subject matter.  Courts routinely reject requests that, like plaintiffs', seek broad categories of information.  *See, e.g.*, *Blue Mountains Biodiversity Project v. Jefferies*, No. 2:20-cv-02158-SU, 2021 WL 3683879, at *5 (D. Or. Aug. 19, 2021) (concluding that "materials, including internal communications from the agency" were not properly part of the administrative record), *objs. overruled sub nom. Blue Mountains Biodiversity Project v. Jeffries*, No. 2:20-cv-2158-MO, 2021 WL 5150659 (D. Or. Sept. 29, 2021), *aff'd*, 99 F.4th 438 (9th Cir. 2024); *Xerces Soc'y*, 682 F. Supp. 3d at 955 (denying request where the plaintiffs did "not identify any specific deliberative documents on which the agency relied that they believe should be included in the administrative records").

Plaintiffs' fifth request, for alternative design documents, appears to present a closer call.  As to this request, plaintiffs seek non-specific documents related to prior designs that were changed pursuant to early feedback.  Like the letters, plaintiffs' fifth request is temporally narrowed to the period of December 2021 to October 2022, and unlike the remainder of plaintiffs' categorical requests, this request appears to reference non-speculative documents that are concretely known to exist.  Nonetheless, "[t]he proper touchstone remains the decision makers' actual consideration, and a party moving to complete the record must show with clear evidence the context in which materials were considered by decision makers in the relevant decision making process."  *Wildearth Guardians*, 713 F. Supp. 2d at 1256.  Put differently: "the party [seeking to complete the record] need not show that the decision maker read the [document in

question], but the party must show that the [document in question] was so heavily relied on in the recommendations that the decision maker constructively considered it." *Id.* The Court cannot say that plaintiffs have met this burden here.

Plaintiffs additionally point to *Doe I v. United States Department of Homeland Security* to argue that they have satisfied their burden by identifying gaps in the record, including the "absence of any communications." No. 20-cv-07517-BLF, 2021 WL 3402311, at *3 (N.D. Cal. Aug. 4, 2021), *objs. overruled*, No. 20-cv-07517-BLF, 2021 WL 5121169 (N.D. Cal. Nov. 2, 2021). It is true that the court in *Doe* did not require the plaintiff to "identify individualized documents," but the court did require "sufficient specificity." *Id.* at *2. The plaintiff in *Doe* met that bar by showing "the complete absence of any mention or explanation for the over three-year delay in adjudicating Doe I's I-485 application," that reversed the agency's prior finding and "the absence of any communications from agency personnel below the Direct of the USCIS Nebraska Service Center." *Id.* Under those circumstances, the court found it "reasonable, and non-speculative, for [the plaintiff] to believe that there are documents in the record that shed light on why [the defendants] reversed their three-year-old decision" and that it was "reasonable, and non-speculative, to believe that agency employees other than the Director of a massive service center were involved in the review of Plaintiffs' case." *Id.* at *3. The situation here is not comparable. Plaintiffs do not seek information about a specific individualized decision, nor do they claim that there is a total absence of communications in the record—on the contrary, the record here contains numerous letters from plaintiffs themselves, as well as communications from community members and internal employees. *See, e.g.*, CITY_00000004-59 (showing emails to and from defendants); CITY_00001435 (letter from the Richmond Neighborhood Association); CITY_00000201-07 (showing emails to and from Sakr).

    b.    Letters

As mentioned above, plaintiffs do specifically describe four letters that they sent to or received from Home Forward that are not found within the record. Pls. Mot. to Complete or Suppl. Admin. R. 9.[3]

---

[3] In reply, plaintiffs mention two additional sources: a Richmond Neighborhood Association Board meeting

These letters are dated August 7, September 9, October 12, and October 14, 2022. Defendants state that they excluded these documents because they predate Home Forward's request for federal funding and therefore predate defendants' NEPA obligations. Defs. Resp. to Pls. Mot. to Complete or Suppl. the R., ECF [42], at 11-13. Plaintiffs argue that this date is arbitrary because Home Forward began investigating the Project years before it sought funding—as early as 2008. Pls. Reply Supp. Mot. to Complete or Suppl. the R. 2.

The Court finds that completion of the record with the letters is not appropriate. As an initial matter, there does not appear to be any authority to suggest that documents created before NEPA obligations arise are categorically excluded from the record. By the same token, there does not appear to be any authority showing that the administrative record *must* include information that predates NEPA obligations. Regardless, the burden is on plaintiffs to rebut the presumption of completeness. Here, plaintiffs have not sufficiently shown that the record is incomplete absent the four identified letters, nor have they shown any "reasonable, non-speculative grounds for the belief that the [letters] were considered by the agency." *Audubon Soc'y of Portland*, 2017 WL 6376464, at *4. Given the gap in time between the dates of the letters and the issuance of the EA in this case, and in light of the plethora of more contemporaneous communications that were considered and included in the record, it appears speculative to think that those letters were, either directly or indirectly, considered by defendants. As such, the Court finds that plaintiffs have not overcome the burden of completeness. Furthermore, plaintiffs' briefing suggests that the relevant record could go back more than ten years. This makes clear that some reasonable delineation—even if

---

that occurred on August 8, 2022, and a "Timeline of Community and Resident Engagement" from December 2021 through May 2023, CITY_00001003, which plaintiffs assert lists communications that are not included in the record. Courts generally have discretion to disregard new matters raised on reply. *See Cal. Pipe Recycling, Inc. v. Sw. Holdings, Inc.*, No. CV F 08-0236LJOSMS, 2009 WL 424325, at *6 (E.D. Cal. Feb. 19, 2009) (citing *Lujan v. Nat. Wildlife Fed.*, 497 U.S. 871, 894-95 (1990)). Regardless, plaintiffs have not demonstrated that the information from these sources was considered by the City. Indeed, "the mere existence and alleged availability of the documents" does not necessarily mean that "they were considered by [the agency], at least indirectly. *Nw. Env't Advocs.*, 2019 WL 6977406, at *6. Courts have previously found insufficient that documents were merely cited in the record. *Id.* (citing *Audubon Soc'y of Portland v. Zinke*, No. 1:17–cv–00069–CL, 2017 WL 6376464, at *5 (D. Or. Dec. 12, 2017) and *The Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 667 F. Supp. 2d 111, 112-14 (D.D.C. 2009)).

perceived by plaintiffs to be an arbitrary one—is necessary. For all these reasons, plaintiffs' request to complete the administrative record is denied.

2.    *Supplementing the Administrative Record*

Plaintiffs' supplementation request fares no better. Plaintiffs argue that they have shown that supplementation is necessary to determine whether defendants considered "all relevant factors" and whether the City conducted an independent review. Pls. Reply Supp. Mot. to Complete or Suppl. Admin. R., ECF [52]. However, plaintiffs appear to muddle the merits into their request. Elsewhere in the briefing, plaintiffs argue that the absence of the requested documents from the record shows that the City "clearly violated the NEPA" and, accordingly, "this Court should vacate and remand the EA and FONSI." Pls. Mot. to Complete or Suppl. Admin. R. 11. But supplementation "of the evidence to determine the correctness or wisdom of the agency's decision is not permitted, even if the court has also examined the administrative record." *Asarco, Inc.*, 616 F.2d at 1160. What plaintiffs really request is vacatur dressed as supplementation, and that is not allowed. *See id.* at 1161 (cautioning that reviewing evidence that was "considered for the purpose of judging the wisdom of the" agency "necessarily led the district court to substitute its judgment for that of the agency").

Plaintiffs' cited case law does not alter this analysis. In *Airport Impact Relief, Inc. v. Wykle*, the court found that "the administrative record [did] not fully detail precisely what steps [the agency] took to reach its conclusion," while affidavits offered as supplementation showed these precise steps. 45 F. Supp. 2d 89, 101 (D. Mass.), *aff'd*, 192 F.3d 197 (1st Cir. 1999). Here, plaintiffs seek broad discovery into documents that, per plaintiffs' own motion for summary judgment, may not even exist. *See* Pls. MSJ 20. Granting plaintiffs' request impermissibly risks shifting "the focal point for judicial review" from "the administrative record already in existence" to "some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Plaintiffs have not "identif[ied] general subject matter demonstrably relevant to the decision, but wholly neglected by the deciding agency," nor have they shown the applicability of any other of the limited exceptions allowing for supplementation. *Nw. Env't Advocs.*,

2019 WL 6977406, at *9.  Therefore, plaintiffs' request to supplement the administrative record is denied.

## C.    Cross-Motions for Summary Judgment

All parties have cross-moved for summary judgment.  Plaintiffs' summary judgment motion raises four primary arguments: (1) defendants did not consider a reasonable range of alternatives; (2) defendants relied on inaccurate data and assumptions; (3) defendants did not ensure sufficient public participation; and (4) the City improperly delegated responsibility for the EA to Home Forward and Dudek.  Each of these grounds, plaintiffs argue, constitute sufficient bases to vacate and remand the EA.  Defendants disagree with these arguments and present several separate grounds for summary judgment, to which plaintiffs did not reply.  Accordingly, this case largely rises and falls on the four alleged deficiencies plaintiffs identify.  For the reasons described below, none of these bases necessitate judgment in plaintiffs' favor.

1.    *Plaintiff's Summary Judgment Motion*

a.    Reasonable Range of Alternatives

Defendants have satisfied their obligation to consider a reasonable range of alternatives.  Agencies are required under NEPA to "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(H).[4]  This general obligation applies regardless of whether an agency is preparing an EIS or an EA.  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005).  However, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Id.* at 1246.  When preparing an EA, like the one at issue here, an agency need only prepare a "[b]rief discuss[ion]" of reasonable alternatives.  40 C.F.R. § 1501.5(c) (2020); *see Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 915 (9th Cir. 2012) ("'[W]ith an EA, an agency only is required to include a brief discussion of reasonable alternatives.'" (quoting *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008))).

Plaintiffs' arguments here are two-fold: first, that defendants wrongly limited the landscape of

---

[4] Prior to this statute's 2023 revision, this provision was contained in subsection E.  *See* 42 U.S.C. § 4332(2)(E) (1975).  The Court understands the parties' citations to section 4332(2)(E) to refer to the requirement currently codified at section 4332(2)(H).

alternatives to a "preferred" plan and a "no action" alternative, and second, that defendants did not sufficiently consider plaintiffs' preferred proposal.

On the first point, defendants did not err in focusing on two alternatives. The Ninth Circuit has "repeatedly held that an agency satisfies NEPA when it considers only two alternatives—action and no action." *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023). Plaintiffs argue that this is only true in exceptional circumstances, but that is not borne out by the case law. In *Earth Island Institute*, the agency met the "reasonable alternative" requirement by "contemplating two alternatives to reach [its] goal: action or no action." *Id.* at 1060. In *North Idaho Community Action Network*, the Ninth Circuit held that the agencies met this requirement by considering "two alternatives: the [p]roject with the changes proposed in the . . . EA, and the [p]roject without the proposed changes." 545 F.3d at 1153. Two alternatives were also sufficient in *Native Ecosystems Council*, in which the Ninth Circuit concluded that "a plain reading of the regulations doom[ed]" the plaintiff's argument that "having only two final alternatives—no action and a preferred alternative—violates the regulatory scheme." 428 F.3d at 1246. None of these holdings were cabined to exceptional circumstances, and plaintiffs have not shown any reason why full consideration of just two options should automatically be deemed unreasonable here. It was not *per se* unreasonable for defendants to consider two alternatives in their EA, and plaintiffs have not shown that defendants violated their NEPA obligations by doing so here.

Nor have plaintiffs shown that defendants violated their obligations by failing to consider plaintiffs' preferred proposal. Reasonable alternatives are assessed based on the project's purpose and need. *Earth Island Inst.*, 87 F.4th at 1065. Here, the Project's purpose "is to provide affordable housing in an underserved area of the City of Portland" and to "contribute critical housing stock to the Portland region." CITY_00000217-18; CITY_00000303. Plaintiffs have not carried their burden of "explaining how [their] suggested alternatives could reach that goal." *Earth Island Inst.*, 87 F.4th at 1066. In support of their preferred proposal, plaintiffs point to a series of drawings prepared by volunteer planners. *See* CITY_00001379 (showing seven alternative concepts depicted in hand-drawn figures). The proposal states

that the figures "demonstrate[] that there are many alternatives to meet the same proposed density goals while meeting the general scale and character of [the] neighborhood," but the proposal does not indicate how many units each proposed drawing would include. *Id.* In briefing, plaintiffs elaborate that their proposal would include "smaller townhome-style buildings, similar to Home Forward's own Stephens Creek Crossing Project." Pls. MSJ 12. But as defendants note, Stephens Creek has only 122 units, *see* CITY_00001533, while the Project originally aimed for 180 units before compromising to 166 units based on community feedback, *see* CITY_00004041. CITY_00004126-28. As the challenging party, plaintiffs "have a duty to show that the alternative is viable." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1087 (9th Cir. 2013). Design sketches and a reference project that is more than twenty-five percent smaller are not sufficient to carry that burden to show that defendants failed to consider alternatives that would meet the Project's stated goal. *See* CITY_00000249 (providing that "[a] lower density alternative would not sufficiently meet the project need for lack of affordable housing in Southeast Portland and to reduce waitlists for affordable housing."). Because plaintiffs have not identified a viable alternative, plaintiffs have not shown that defendants failed to consider a reasonable range of alternatives.

            b.    Reliance on Accurate Data and Assumptions

Defendants have taken a "hard look" at the Project's effects as required under NEPA. *Native Ecosystems Council*, 418 F.3d at 964. Plaintiffs argue that defendants failed to meet this obligation because they "rel[ied] on incorrect assumptions [and] data." *Id.* Specifically, plaintiffs allege four failures: (1) failure to accurately describe the neighborhood's visual character; (2) failure to properly assess traffic and safety impacts; (3) failure to substantively assess the impacts on the surrounding environment; and (4) failure to properly consider plaintiffs' preferred alternative plan. The record does not support plaintiffs' allegations.

First, "conclusory assertions" regarding relevant facts and conditions can render an EA inadequate. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020). Here, however, the EA does not rely on inaccurate data or conclusory assertions about the neighborhood's character. The record shows that the

Project site is zoned "for Multi-Dwelling Residential [] land uses," that its zoning "already supports a significantly higher housing density than what is currently built onsite," and that the "City's Comprehensive Plan supports the construction of more densified housing." CITY_00003275; CITY_00000230; *see* CITY_00004153 ("Local Government Verification that Development is Consistent With Zoning and Land Use Regulations"); *see also* CITY_00001440 (showing the zoning codes for the Project's site and surrounding areas). Defendants' Transportation and Parking Study shows that the Project is situated a few blocks away from Division Street and Cesar E. Chavez Boulevard, both of which contain a mix of commercial and multi-family residences. CITY_00002601; CITY_00002608; *see* CITY_00001440. Nothing in the record suggests that these facts are inaccurate.

Plaintiffs do not dispute that factual accuracy but instead argue that the EA still fails on this point because it does not sufficiently analyze aesthetics. It is true that NEPA considers the "aesthetic, historic, [and] cultural" effects of proposed actions. 40 C.F.R. § 1508.1(i)(4). However, NEPA does not require the detailed examination that plaintiffs propose. Relying on *Surfrider Foundation v. Dalton*, plaintiffs argue that defendants' efforts were insufficient here because they did not include "[c]omputer-generated before-and-after pictures." 989 F. Supp. 1309, 1321 (S.D. Cal. 1998), *aff'd sub nom. S.D. Chapter of the Surfrider Found. v. Dalton*, 196 F.3d 1057 (9th Cir. 1999) (per curiam). But *Surfrider* does not stand for the position that before-and-after pictures *must* be included in an EA; these pictures were merely one portion of the EA that the court considered in its review. *Id.* Additionally, *Surfrider* was not based on the same regulation at issue here. While this EA is governed by 40 C.F.R. § 1508.1(g)(4) (2020), the EA in *Surfrider* was governed by 40 C.F.R. § 1508.27(b)(3), which expressly directed agencies to consider "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas." 989 F. Supp. at 1320.

*National Parks Conservation Association v. Semonite* is also inapposite. 916 F.3d 1075 (D.C. Cir. 2019), *am. on reh'g in part*, 925 F.3d 500 (D.C. Cir. 2019). In *Semonite*, the project at issue involved a situation "where Congress's purpose in designating the resources was to preserve an unencumbered view

of an attractive scenic expanse." *Id.* at 1087 (citation modified). This specific site involved "the nation's only Congressionally-designated historic water trial" and therefore required further examination of the "'[u]nique characteristics of the geographic area such as proximity to historic or cultural resources,'" due to a now-inapplicable regulation. *Id.* at 1086 (quoting 40 C.F.R. § 1508.27(b)(3)). The Project here does not involve an area designed to preserve an attractive scenic expanse—as the record shows, it is an area designated for multi-family residences.

Second, the EA sufficiently considers traffic and safety impacts. As to traffic, defendants completed a comprehensive Transportation and Parking Study. *See* CITY_00002596-626. The study evaluated street capacity, transit access, parking impacts, travel demand projections, and neighborhood impacts, among other things. *Id.* Plaintiffs may disagree with the study's conclusions, but there is no reasonable basis to claim defendants failed to take a hard look at traffic impacts. As to public safety, plaintiffs argue that the EA is insufficient because it did not include a Crime Prevention Through Environmental Design ("CPTED") evaluation as required under Portland Resolution No. 3664. *See* Portland City Policy ENB-2201. Defendants respond that the EA did consider CPTED guidelines, *see* CITY_00000310, and regardless, NEPA only requires agencies to examine potential effects on the physical environment, not on social fears or anxieties. *See Metro. Edison Co.*, 460 U.S. at 777 ("The operation of the facility is an event in the physical environment, but the psychological health damage to neighboring residents resulting from unrealized risks of crime is too far removed from that event to be covered by NEPA.").

Plaintiffs' third and fourth points rehash arguments made elsewhere in their briefs. Plaintiffs argue that defendants failed to substantively consider public comments, which is addressed below, and that defendants failed to consider reasonable alternatives, which is addressed above. For the reasons stated elsewhere in this opinion, these arguments also fail. Plaintiffs have therefore failed to show that the EA relies on inaccurate data and assumptions.

//

c.    Public Participation

Defendants have also adequately complied with NEPA's public participation requirements. As plaintiffs concede, defendants satisfied NEPA's technical requirements by publishing the FONSI and associated Notice in a local newspaper and by holding a thirty-three-day public review period. Pls. MSJ 22 (citing 40 C.F.R. § 1501.5(e) and 24 C.F.R. §§ 58.43, 58.45). Nonetheless, plaintiffs argue that defendants' efforts are still insufficient because the (1) City was poised to approve the Project before the EA was posted; (2) defendants were not responsive enough to public input; and (3) the posting's format inhibited public participation.

The record shows that defendants surpassed NEPA's requirement to "make diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a) (2020). The record is replete with defendants' efforts to involve the public. Home Forward began engaging with residents of the Apartments in 2021. CITY_00004035. Over the following years, defendants formed and utilized a community advisory committee; communicated directly with members of the public; and held meetings with the Richmond Neighborhood Association, Peaceful Villa residents, and members of the surrounding community. *Id.* For many months, defendants actively engaged with the community and key stakeholders—well beyond the mandated notice period.

Plaintiffs' view would essentially punish defendants for seeking and incorporating early feedback. As a result of the community's input, Home Forward made numerous changes to the Project's plans including reducing the number of units from 180 to 166, increasing on-site parking by 20 spaces, eliminating a fourth story through most of the Project space, increasing setback along Clinton Street "to reduce visual scale and increase plantings," increasing the setback on the southwest corner to add parking and reduce the building's height, and re-orienting a plaza "to better maintain resident privacy at inner courtyards." CITY_00004041. As a result of this early outreach, defendants were able to incorporate and respond to community feedback before publishing the EA. *Id.* Plaintiffs use this to argue that the comment period was illusory since defendants did not make further changes after publishing the EA. But plaintiffs'

view would discourage early community involvement and thus run contrary to NEPA's "twin aims" of ensuring consideration of "every significant aspect of the environmental impact of a proposed action" and informing the public about these considerations. *Kern*, 284 F.3d at 1066; *see* 40 C.F.R. § 1500.1(b) ("NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made.").

Although defendants did not make further changes, the record shows that they did consider the additional comments raised during the notice period. NEPA requires agencies to "consider the comments and make modifications, ***if appropriate***, in response to the comments, before [they] completes [their] environmental certification and before the recipient submits its" request for funds. 24 C.F.R. § 58.43(c) (emphasis added). Here, defendants prepared a detailed and categorically organized response to the comments they received during the notice period. CITY_00000299; CITY_00000635-64. Defendants also prepared separate individual responses to certain comments, on top of the collective response document. *See* CITY_00000303-05. The record shows that defendants sufficiently considered and responded to public comments, defeating plaintiffs' first two arguments on this point.

So too does the record negate plaintiffs' argument that the FONSI Notice was inaccessible. Defendants published the FONSI Notice in a local newspaper, *The Oregonian*. CITY_00002644-45. They also expanded the comment period from fifteen to thirty-three days at the request of the Richmond Neighborhood Association. CITY_00000750-51. And, as plaintiffs admit, the posting garnered over 300 public comments during this window, clearly showing that it was accessible and enabling of public participation. *See* CITY_00000299. Plaintiffs have not shown that defendants failed to satisfy NEPA's public participation requirements.

d.    Delegation

Lastly, defendants satisfied NEPA's delegation and independent review requirements. Plaintiffs' final contention is that the City unlawfully delegated its NEPA responsibilities to Home Forward and Dudek in violation of 40 C.F.R. § 1506.5 because (1) the City did not conduct a sufficient independent review and

26

(2) Dudek did not sign a conflict-of-interest disclosure.  Neither argument commands a finding in plaintiffs' favor.

NEPA's implementing regulations allows agencies to delegate the preparation of environmental documents to outside entities, including applicants and contractors.  40 C.F.R. § 1506.5 (2020).  When an agency delegates document preparation to an applicant, the agency is required to "assist the applicant by outing the types of information required " and "independently evaluate the information submitted" while ensuring responsibility for the document's "accuracy, scope, and contents."  *Id.* § 1506.5(b)(1)-(2).  NEPA's regulations specifically contemplate applicants and contractors preparing EAs.  *Id.* § 1506.5(b)(4).  When an agency delegates preparation to an applicant or contractor, that applicant or contractor must submit to the agency a "disclosure statement . . . that specifies any financial or other interest in the outcome of the action."  *Id.* § 1506.5(b)(4).

Here, the City delegated EA preparation to the applicant, Home Forward.  CITY_00001678.  Plaintiffs do not contest that Home Forward is the applicant in this situation and there is nothing in the record showing otherwise.  Home Forward, in turn, delegated certain responsibilities to Dudek, a contractor.  *Id.*; CITY_00000216.  Again, there is no dispute as to Dudek's role.  Plaintiffs argue that even if this delegation was mechanistically appropriate, it was not carried out lawfully because the City did not independently review the EA.  In support of this argument, plaintiffs cite several documents where the City described its "limited" and "administrative" role in the EA's preparation.  *See* CITY_00000080; CITY_00000665; CITY_0001290; CITY_00001323; CITY_00004030.  Plaintiffs further argue that the record is silent as to any draft mark-ups, technical review memoranda, or requests from the City for additional analyses.  Taken together, plaintiffs argue that this shows insufficient independent evaluation.

Neither the evidence nor case law support plaintiffs' conclusion.  Turning first to the documents, plaintiffs cite five email threads involving Anna Shook, the City's Certifying Officer.  The first email thread, dated March 16, 2023, is a conversation between Shook, Sakr, and Home Forward's Project Coordinator.  CITY_00004030.  In response to Sakr's concerns about the EA process, Shook responds that "[i]t is Home

Forward's responsibility to conduct the [EA] and submit their backing documentation to me to review for legal sufficiency. . . . When I receive the [EA], I will consult with HUD's environmental review experts on the feasible alternative requirement." *Id.* The second email thread, dated December 20, 2023, is a conversation between Shook and City personnel. CITY_00001323. There, Shook says that she will review and respond to comments on the EA with help from "Home Forward's environmental review consultants and project managers." CITY_00001324. The third email thread, dated December 27, 2023, shows an internal correspondence between City personnel explaining that the City's role is "administrative" as "related to the [EA] process" and that NEPA procedures had "been followed appropriately" because Shook had "been responsive to the neighbors and in communication with HUD and Home Forward." CITY_0001290. The fourth email, dated February 2, 2024, is from Shook to Leanne Mitchell. CITY_00000665. Therein, Shook explains that she "review[s] all EAs submitted by local entities" and that, in her "limited role as a reviewer, not author, of the [EA] . . . [she] consulted with Home Forward on all issues raised." *Id.* Shook repeated this description of her role in the fifth and final email thread, which is dated February 27, 2024, and contains a conversation between Shook and Skenderian. CITY_00000080. None of these emails show that the City failed to conduct an independent evaluation of the EA as required under NEPA.

The City's independent review is documented elsewhere in the record. *See, e.g.*, CITY_00000168-70; CITY_00001149-54 (email from Shook asking Home Forward to send her specific questions by email so that she can address them); CITY_00001483-85 (email from Shook to Skenderian explaining that Shook will respond to comments substantively as able and will share comments with Home Forward); CITY_00001662-63 (email from Shook to Skenderian answering Skenderian's questions and explaining her review process); CITY_00000873-75 (email thread between Shook and personnel from HUD, Home Forward, and Dudek discussing comment responses); CITY_00000820-21 (email thread showing a January 29, 2024 meeting between Shook and Dudek personnel); CITY_00002800-04 (Shook email saying she would "go back through the references in the separate laws and authorities and correct them" and that she

would "go back through and do a final review and will probably have a list of clarifications" needed "before [she could] approve [the EA]"); CITY_00002913-17 (Shook email explaining that she needs to review and sign off on the EA). Plaintiffs are correct that the documents do not show detailed, heavy-handed involvement—but that is not what NEPA requires. NEPA expressly allows for applicants and applicant-directed contractors to prepare EAs and there is no dispute that Home Forward and Dudek prepared the EA here. The City may not have been extensively involved in the EA's minutia, but the record shows that it did conduct an independent evaluation and thus met its NEPA obligations.

Case law confirms that NEPA requires no more than what defendants have shown here. As an initial matter, "[a]n EA may be based entirely upon information supplied by the applicant and indeed may be prepared by an outside consulting firm." *Friends of the Earth v. Hintz*, 800 F.2d 822, 835 (9th Cir. 1986) ("*Hintz*"). The "independent review" requirement does not mean that the agency must "conduct a further study" or "independently investigate" proposed alternatives. *Id.* In *Hintz*, the Ninth Circuit found that the agency met this requirement by requesting reports, consulting "federal and state agencies," analyzing information, asking questions, requesting revisions, and reaching a rational conclusion. *Id.* Likewise, in *Western Watersheds Project v. McCullough*, the agency met the "independent evaluation" requirement by requesting datasets, providing comments, requesting supplemental information, and conducting meetings. 2023 WL 4557742, at *2. Delegation does not require agencies to redo work—it merely requires independent review. *See Stop B2H Coal. v. Bureau of Land Mgmt.*, 552 F. Supp. 3d 1101, 1139 (D. Or. 2021); *see also Clatsop Residents Against Walmart v. U.S. Army Corps of Eng'rs*, 735 F. App'x 909, 911 (9th Cir. 2018) ("No regulation imposes a standalone requirement that the Corps independently evaluate an applicant's submissions when preparing an EA."). The record shows that the City properly delegated and independently evaluated the EA here.

As to the conflict-of-interest disclosure requirement, plaintiffs provide no authority showing that failure to do so is a basis for vacatur. The operative version of the regulation, 40 C.F.R. § 1506.5, was promulgated in 2020. *See* Final Rule by the Council on Environmental Quality, 85 Fed. Reg. 43,304,

43,371 (July 16, 2020). It requires "[c]ontractors or applicants preparing environmental assessments or environmental impact statements [to] submit a disclosure statement to the lead agency that specifies any financial or other interest in the outcome of the action." 40 C.F.R. § 1506.5(b)(4).

The Court cannot locate—and defendants have not identified—any evidence in the record that a proper conflict-of-interest disclosure was provided as required by the 2020 regulations. In turn, the Court cannot locate—and plaintiffs have not identified—any evidence in the record that Dudek had a conflict of interest. Plaintiffs contend only that "Dudek was hired and paid by Home Forward so it had a clear financial interest in satisfying the client." Pls. MSJ 25. This is less a conflict of interest and more an inevitability; if being hired by the applicant automatically created an impermissible conflict of interest, it would render the regulation's provisions related to applicant-hired contractors irrelevant. Nonetheless, even if Dudek did have an undisclosed conflict of interest, "a contractor's technical conflict of interest does not lead to the automatic invalidation" of an environmental document. *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 608 (9th Cir. 2018). In the absence of a proper disclosure (or the appearance of some conflict), "the Court 'can evaluate the oversight that the agency provided to the [EA] process as a factual matter and make a determination upholding the [EA].'" *Id.* (quoting *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998)). As discussed above, the Court finds that the City provided effective oversight of the EA process, which was sufficient to ensure the integrity of the EA. Accordingly, plaintiffs have shown no error in the City's delegation.

### 2. *Defendants' Grounds for Summary Judgment*

Plaintiffs do not oppose defendants' other stated grounds for summary judgment. *See* Home Forward Resp. to Pls. MSJ, ECF [33]; Home Forward Cross-MSJ; Pls. Reply Combined Opp'n to Defs. Cross-MSJs & Reply Supp. Pls. MSJ, ECF [49]. Based on the above analysis, defendants did not violate

NEPA.[5]  Defendants' "final decision was reasonable and reasonably explained" and there is no reason for the Court to vacate the EA or remand the Project back to defendants.  *Seven Cnty.*, 605 U.S. at 185.  Plaintiffs' motion for summary judgment is therefore denied and defendants' cross-motions for summary judgment are granted.

## CONCLUSION

For the reasons stated herein, plaintiffs' motion to complete or, in the alternative, supplement the administrative record, ECF [38], is DENIED; plaintiffs' motion for summary judgment, ECF [32], is DENIED; and defendants' cross-motions for summary judgment, ECF [34], [36], [37], are GRANTED.  Plaintiffs' motion for leave to withdraw their request for supplemental briefing, ECF [61], is also GRANTED, and plaintiffs' motion for leave to file supplemental briefing, ECF [57], is thus WITHDRAWN.  Judgment shall follow.


IT IS SO ORDERED.


DATED this 18th day of February, 2026.

Adrienne Nelson
United States District Judge

---

[5] Having found summary judgment should be granted in favor of defendants, the Court does not reach the federal defendants' arguments regarding their specific liability for the challenged actions.  *See* Def. City Resp. to Pls. MSJ, ECF [35]; City Cross-MSJ; Federal Defs. Reply Supp. Cross-MSJ, ECF [56].